# In the United States Court of Federal Claims

No. 11-768C; 12-201C (Consolidated)
(Filed: April 29, 2015)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
SALMA ACEVEDO, *et al.*,                \*   Tucker Act; 28 U.S.C. § 1491;
                                        \*   Subject Matter Jurisdiction;
             Plaintiffs,    \*   RCFC 12(b)(1); 5 U.S.C. § 5928;
                                        \*   Danger Pay; 5 U.S.C. § 5922.
    v.                             \*
                                        \*
THE UNITED STATES OF AMERICA,           \*
                                        \*
             Defendant.     \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Linda Lipsett*, Bernstein & Lipsett, P.C., Washington, D.C., for plaintiff. Arguing the motion on behalf of the plaintiffs, *Jules Bernstein*.

*Lauren Springer Moore*, *Shalom Brilliant*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With them on the briefs were *Reginald T. Blades, Jr.*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Stuart F. Delery*, Assistant Attorney General, Department of Justice; and Of Counsel were *Lindsay K. Solensky* and *Megan Z. Snyder*, Office of Chief Counsel, United States Customs and Border Protection.

## CORRECTED OPINION AND ORDER[*]

---

[*] Pursuant to Rule 60(a) of the Rules of the Court of Federal Claims, this Corrected Opinion and Order "correct[s] a clerical mistake arising from oversight or omission" in this Court's April 28, 2015 Opinion and Order granting defendant's motion to dismiss Count II of plaintiffs' third amended complaint. See Agro Dutch Indus. Ltd. v. United States, 589 F.3d 1187, 1192 (Fed. Cir. 2009) (finding that under Federal Rules of Civil Procedure 60(a) courts "may correct clerical errors in previously issued orders in order to conform the record to the intentions of the court and the parties"). Specifically, contrary to what was stated in the April 28, 2015 Opinion and Order, plaintiffs did not formally file their third amended complaint until April 29, 2015. In addition, the previous Opinion and Order erroneously directed the Clerk of the Court to enter judgment pursuant to RCFC 54(b). See Opinion and Order at 10, ECF No. 70. The Court therefore **WITHDRAWS** its Opinion and Order issued on April 28, 2015 (ECF No. 70) and **VACATES** the judgment entered on April 29, 2015 (ECF No. 71).

**Kaplan, Judge.**

The plaintiffs in this case are present and former Supply Chain Security Specialists employed by U.S. Customs and Border Protection, Department of Homeland Security (hereinafter "CBP"). In Count I of their complaint, plaintiffs seek back pay, liquidated damages, attorney fees and other relief to remedy alleged violations of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 216(b) (FLSA). Third Am. Compl. ¶¶ 21-23, April 29, 2015, ECF No. 72 [hereinafter "Compl."]. In Count II, plaintiffs allege violations of 5 U.S.C. § 5928, arising out of CBP's refusal to provide them with danger pay allowances for work performed in posts of duty that the Department of State has designated as eligible for such allowances. Id. ¶¶ 25-26.

Currently before the Court is the government's Motion to Dismiss Count II of the plaintiffs' Second Amended Complaint, pursuant to Rules of the Court of Federal Claims (RCFC) 12(b)(1).[2] The government contends that the Court lacks Tucker Act jurisdiction over plaintiffs' claims alleging violation of 5 U.S.C. § 5928 on the grounds that it is not a money-mandating statute, that the regulations issued by the Secretary of State to implement the statute are not money-mandating, and that CBP has not itself adopted any rules, regulations or other policies establishing employees' entitlement to danger pay. Def.'s Mot. 4-7, June 24, 2014, ECF No. 54.

For the reasons set forth below, the Court agrees with the government. Accordingly, its motion to dismiss Count II of the complaint is **GRANTED**.

## BACKGROUND

**I.    Statutory and Regulatory Framework**

As noted, in Count II of their complaint, plaintiffs allege that they have been unlawfully denied danger pay allowances "for work performed in posts designated as dangerous by the Secretary of State in accordance with the provisions set forth in 5 U.S.C. § 5928." Compl. ¶ 25. Section 5928 became law in 1980 as a result of the Foreign Service Act of 1980. Pub. L. No. 96-465, Title II, § 2311(a), 94 Stat. 2166 ("the danger pay statute"). It provides as follows:

> An employee serving in a foreign area may be granted a danger pay allowance on the basis of civil insurrection, civil war, terrorism, or wartime conditions which threaten physical harm or imminent danger to the health or well-being of the employee. A danger pay allowance may not exceed 35 percent of the basic pay of the employee, except that if an employee is granted an additional differential under section 5925(b) of this title with respect to an assignment, the sum of that additional differential and any danger pay allowance granted to the employee with

---

[2] The Court recently granted plaintiffs leave to file a third amended complaint to add two additional plaintiffs. See Order Granting Motion to Amend Pleadings, Feb. 25, 2015, ECF No. 67. The substance of the allegations in the third amended complaint is identical to that in the Second Amended Complaint. Citations to the complaint are to the third amended complaint.

respect to that assignment may not exceed 35 percent of the basic pay of the employee.  The presence of nonessential personnel or dependents shall not preclude payment of an allowance under this section.  In each instance where an allowance under this section is initiated or terminated, the Secretary of State shall inform the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate of the action taken and the circumstances justifying it.

5 U.S.C. § 5928.  Section 5922(c) of Title 5 provides that:

> The allowances and differentials authorized by this subchapter [including the danger pay allowance] shall be paid under regulations prescribed by the President governing—
> (1) payments of the allowances and differentials and the respective rates at which the payments are made;
> (2) the foreign areas, the groups of positions, and the categories of employees to which the rates apply; and
> (3) other related matters.

Pursuant to Executive Order No. 10903, as amended, the President delegated his authority to promulgate regulations governing the payment of allowances under section 5928 to the Secretary of State.  Exec. Order No. 10903, 3 C.F.R. § 433 (1959-1963); see also Department of State Standardized Regulations (DSSR) §§ 011(a), 650.  The regulations provide that the "danger pay allowance prescribed in Chapter 650 may be granted to employees defined in Section 040i."  DSSR § 031.2.  In addition to delineating the relationship between danger pay allowances and other post differentials, the DSSR prescribes the criteria and procedures that the Secretary of State will use to determine which posts of duty qualify for danger pay.  See DSSR § 654.1.  Thus, according to section 653.1 of the DSSR:

> A danger pay allowance is established by the Secretary of State when, and only when, civil insurrection, civil war, terrorism or wartime conditions threaten physical harm or imminent danger to the health or well being of a majority of employees officially stationed or detailed at a post or country/area in a foreign area. To determine whether the situation meets the danger pay criteria, a post usually must submit the Danger Pay Factors Form (FS-578) along with pertinent supporting information to the Department of State (Office of Allowances) for review. The Director of the Office of Allowances will chair a working group which will make a recommendation to the Assistant Secretary of State for Administration concerning a danger pay designation.

The regulations specify that the amount of danger pay allowances "shall be at the rates of 5, 10, 15, 20, 25, 30 or 35 percent, based on the determined level of danger and the presence of non-essential personnel and dependents at post."  DSSR § 652(f).[3]  They provide that

---

[3] A table of approved rates, both historical and current, is posted on the State Department's website at http://aoprals.state.gov/Web920/danger_pay_all.asp (last visited Apr. 23, 2015).

a "[d]anger pay allowance commences on the date of designation by the Secretary of State for employees present at the post on assignment or detail, and on the date of arrival at post for subsequently assigned or detailed employees or for employees returning to post after temporary absence." DSSR § 654.1.  The allowance "terminates as of the close of business on the day the designation is removed by the Secretary of State, or the day the employee departs the post for any reason for a post or country/area not designated for the danger pay allowance." DSSR § 654.2.

Section 013 of the DSSR is entitled "Authority of Head of Agency."  It states, in pertinent part, as follows:

> When authorized by law, the head of an agency may defray official residence expenses for, and grant . . . danger pay . . . to an employee of his/her agency and require an accounting therefor, subject to the provisions of these regulations and the availability of funds. Within the scope of these regulations, the head of an agency may issue such further implementing regulations as he/she may deem necessary for the guidance of his/her agency with regard to the granting of and accounting for these payments.

**II.    CBP Policy/Practice Regarding Danger Pay**

According to the government, neither the Department of Homeland Security (DHS) nor CBP has issued any regulations or policies to implement the danger pay statute.  See Smalls Decl. (Def.'s Mot. App. 2) (DHS Human Resources Specialist stating that "DHS does not currently have any policies, rules, procedures, or Department regulations regarding the payment of danger pay differentials to employees of the Department"); McGuirl Decl. (Def.'s Mot. App. 15) (Deputy Executive Director, CBP Human Resources Operations, Programs and Policy, observing that although CBP's Office of Human Resources Management has the delegated authority to develop paysetting policies and to oversee pay administration at CBP, "CBP does not currently have any agency-wide policies, rules, or procedures regarding the payment of danger pay differentials to CBP employees" and stating that CBP has had no policies, rules, or procedures regarding the payment of danger pay since she began employment with CBP in 2011).

Plaintiffs do not allege that CBP has any formal regulations, directives, or policies governing entitlement to danger pay.  They note, however, that the documents CBP produced in discovery[4] reveal that 551 CBP employees received danger pay in fiscal year 2005 through fiscal year 2014.  See Lipsett Decl. (Pl.'s Resp. Ex. 1); see also id. at Attach. A.  Plaintiffs have also submitted examples of cover letters submitted by CBP supervisors to CBP's Payroll office, which formally authorized Danger Pay for certain CBP employees with attached Forms SF-1190, "Foreign Allowances Application Grant and Report."  Pl.'s Resp. Ex. 1, Attach. D.

---

[4] By order of May 13, 2014, the Court granted plaintiffs leave to conduct limited discovery related to any rules, regulations, policies or practices at the Department of Homeland Security or CBP related to the provision of danger pay. ECF No. 47.

4

Plaintiffs further claim that a 2011 exchange of letters between Congressman Mario Diaz-Balart and Michael J. Yeager, CBP's Assistant Commissioner for Legislative Affairs, reveals that CBP has had a practice and de facto policy of providing danger pay to all employees who meet the requirements of the statute and the DSSR. Pl.'s Resp. 1-6. Thus, on March 15, 2011, Cheryl Lise Jacobo, one of the plaintiffs in this case, sent a letter to Representative Diaz-Balart in which, among other things, she requested that the Congressman inquire as to why Supply Chain Security Specialists did not receive danger pay for travel to high risk areas. Jacobo Decl. ¶ 10 (Pl.'s Resp. Ex. 2). Representative Diaz-Balart responded by letter of July 22, 2011, enclosing a July 15, 2011 email from Shannon McCully of CBP's Office of Congressional Affairs, which he characterized as "self-explanatory." Id. at Attach. 3. In that email, Ms. McCully stated as follows with respect to the inquiry concerning danger pay:

> In her letter Ms. Jacobo suggests SCSS [Supply Chain Security Specialists] be entitled to danger pay while in a foreign travel status. Danger pay is determined by DOS. Employees are eligible for payment under 5 CFR 550, Subpart I—Pay for Duty Involving Physical Hardship or Hazard and 5 U.S.C. 5928—Danger Pay Allowance. Employees need to meet the requirements under these authorities to receive payment. CBP pays all employees who meet these regulations accordingly.

Ms. Jacobo wrote a follow-up letter to Representative Diaz Balart, dated August 12, 2011, which addressed matters other than danger pay. Jacobo Decl. ¶ 12. Representative Diaz-Balart responded by letter of November 21, 2011. Id. at Attach. 4. On this occasion, he enclosed a copy of a November 18, 2011 letter signed by Michael J. Yeager, Assistant Commissioner, CBP Office of Congressional Affairs. Id. The Letter contains the same paragraph regarding entitlement to danger pay that was contained in Ms. McCully's email, with the addition of a final sentence advising that "[Ms. Jacobo's] field office may submit the appropriate paperwork (SF 1190) to CBP's Office of Administration's Payroll Division, who will process the payment." Id.

Plaintiffs have also submitted an earlier draft of the letter from Assistant Commissioner Yeager to the Congressman, reflecting the input of employees within CBP's Office of Administration and its Human Management Resources office. See Lipsett Decl. Attach. B. The draft includes two comment boxes associated with the paragraph in the letter addressing danger pay. Id. The first comment box bears the initials "SMc" (which the Court takes to be Ms. McCully) and states, in pertinent part: "Can OA and/or HRM address the following: Why SCSS are not eligible for hazardous/danger pay? If they are eligible, will they receive backpay?" Id. The response, prepared by "PEM" (apparently Erick Perez, also of the Office of Congressional Affairs) states that "OA suggests" the use of the following language:

> In her letter Ms. Jacobo submits that SCSS [Supply Chain Security Specialists] should be entitled to danger pay while in a foreign travel status. This is determined by the Department of State and if that office finds she is eligible, her field office should submit the appropriate paperwork (SF 1190) to CBP Payroll, who will process the payment.

Id.

5

Plaintiffs have also submitted a July 14, 2011 email from Laura H. Roberts, Management and Program Analyst, Office of Human Resources Management, to Erick Perez, which apparently served as the basis of Mr. Perez' commentary on the early draft of the Yeager letter. Lipsett Decl. Attach. C. Ms. Roberts states, with respect to danger pay, that "Employees are eligible for payment under 5 CFR 550, Subpart I—Pay for Duty Involving Physical Hardship or Hazard and 5 U.S.C. 5928—Danger Pay Allowance, employees need to meet the requirements under these authorities to receive payment. CBP pays all employees who meet these regulations accordingly." Id. Ms. Roberts' email further states that "[i]n accordance with the Back pay regulation 5 CFR 550, Subpart H—Back Pay, employees are eligible for back pay accordingly. If the [sic] meets the requirements for Hazardous Duty Pay and Danger Pay further research information is need [sic] to research into this matter." Id.

Finally, plaintiffs have submitted a May 8, 2014 email from Sonja Rodgers-Reed, of CBP's Office of Human Resources Management, HR Operations, Programs and Policy, Staffing Policy and Compensation. That email responds to an inquiry originally posed in March 2014 by Michael Ginn, Director, Customs-Trade Partnership Against Terrorism, Miami Field Office. Lipsett Decl. Attach. G. Director Ginn inquired as to the existence of a CBP policy for approving and processing danger pay when an employee requests such pay. Id. at Attach. F. Ms. Rodgers-Reed's response (which she indicated she needed to verify with the Department of State) explained that "[d]anger pay is administered by the Department of State." Id. at Attach. H. She described the basic purposes of the danger pay allowance, and restated the statutory and regulatory requirements placing a thirty-five percent ceiling on the amount of the allowance, and mandating that the foreign area must be an approved overseas location by the Department of State. Id. She also advised that a current listing of approved areas could be found on the State Department's website. Id. Ms. Rodgers-Reed states that "CBP does not currently have a policy in place for Danger Pay, as it is administered by the Department of State." Id. She explained that "the process for initiating payment of danger pay" required that the employee complete an SF-1190, which would be authorized by their supervisor on the Form, followed by an entry of the "appropriate transaction codes [by the timekeeper] for the employee to be paid." Id.

## DISCUSSION

### I. Legal Standards

In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff. Trusted Integration v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The court may "inquire into jurisdictional facts" to determine whether it has jurisdiction. Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991). The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013).

In this case, plaintiffs contend that the Tucker Act supplies the Court with subject matter jurisdiction over Count II of their complaint, claiming violations of the danger pay statute. The Tucker Act affords this Court jurisdiction to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive

department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012).

The Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages (United States v. Mitchell, 463 U.S. 206, 215 (1983)), but it does not confer any substantive rights. United States v. Testan, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation or constitutional provision. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

In order to base Tucker Act jurisdiction on the violation of statutes and/or regulations, those statutes and regulations "must be such that they 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" Roberts v. United States, 745 F.3d 1158, 1162 (Fed. Cir. 2014) (quoting United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003)). In that regard, "[i]t is enough 'that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages.'" Id. (quoting White Mountain Apache Tribe, 537 U.S. at 473).

## II. Application of Standards

In this case, plaintiffs argue that "the CBP policy and practice of paying danger pay to employees, the relevant statutory provisions of 5 U.S.C. §§ 5921-5928, their legislative history, and the provisions of the DSSR, all serve to establish 5 U.S.C. § 5928 to be money-mandating." Pl.'s Resp. 6. This argument, however, cannot be reconciled with the language of the danger pay statute, its implementing regulations, or the case law.

First, plaintiffs' argument that the danger pay statute gives rise to a substantive right to money damages is contrary to the relevant statutory language. The statute provides that "[a]n employee serving in a foreign area may be granted a danger pay allowance on the basis of civil insurrection, civil war, terrorism, or wartime conditions which threaten physical harm or imminent danger to the health or well-being of the employee." 5 U.S.C. § 5928 (emphasis added). Thus, the language of section 5928 is permissive in nature. Similarly, 5 U.S.C. § 5922(a), which governs all overseas differentials and allowances (including danger pay) also uses the word "may" rather than "shall" and is couched in terms of a grant of authority to agencies, rather than the establishment of an entitlement on the part of employees. It states that "allowances and differentials authorized by this subchapter may be granted to an employee . . .") (emphasis added). As the court of appeals has observed, when Congress uses the word "may" in a statute, "we should use common sense and presume that the word conveys some degree of discretion." McBryde v. United States, 299 F.3d 1357, 1362 (Fed. Cir. 2002).

While the use of the term "may" in a pay statute gives rise to a presumption that the statute is not money-mandating, the presumption "may be rebutted by the 'intent of Congress and other inferences that we may rationally draw from the structure and purpose of the statute at hand.'" Roberts, 745 F.3d at 1163 (quoting McBryde, 299 F.3d at 1362). To that end, the court of appeals has applied an analytical approach that focuses on three characteristics that may

7

indicate that, notwithstanding the use of "may," a statute may be treated as money mandating, at least for some purposes. It has looked to whether a statute (1) provides clear standards for paying an award, (2) states a precise amount to be paid, or (3) compels payment once certain conditions precedent are met. Roberts, 745 F.3d at 1163 (citing Perri v. United States, 340 F.3d 1337, 1343 (Fed. Cir. 2003)); see also Samish Indian Nation v. United States, 419 F.3d 1355, 1364-65 (Fed. Cir. 2005); Doe v. United States, 100 F.3d 1576, 1582 (Fed. Cir. 1996).

Section 5928 does not have any of these attributes. It does not establish clear standards (or any standards for that matter) for deciding when employees face a sufficient threat of harm or danger to justify an award of danger pay. It does not state a precise amount to be paid to employees who work in danger zones; rather it merely provides a ceiling of thirty-five percent of basic pay. And it does not compel payment of danger pay when some condition precedent is met. Cf. Doe v. United States, 463 F.3d 1314, 1325 (Fed. Cir. 2006) (holding that 5 U.S.C. § 5545(c)(2), authorizing premium pay for administratively uncontrollable overtime, is a money mandating statute notwithstanding the use of the word "may," because the statute provides that once an agency determines that a particular position is entitled to AUO pay, the employee "shall" receive premium pay under the statute).[5]

Further, as the court of appeals observed in Roberts, 745 F.3d at 1164, "[o]ne relevant principle drawn from the cases is that a statute (or regulation) providing that money 'may' be paid is not money-mandating if the statute or regulation only authorizes but does not require the payment of money to the class of which the plaintiff claims to be a member, and contemplates that further implementing regulations will be issued defining the circumstances in which money will be paid." That is precisely the case here. See 5 U.S.C. § 5922(c) (providing that "[t]he allowances and differentials authorized by this subchapter shall be paid under regulations prescribed by the President governing: (1) payments of the allowances and differentials and the respective rates at which the payments are made; (2) the foreign areas, the groups of positions,

---

[5] Plaintiffs argue that 5 U.S.C. § 5922(b) refers to an employee's "right of recovery" of danger pay, which right can only be denied if an agency explicitly waives it. Pl.'s Resp. at 9-10, 12. But plaintiffs have misconstrued this provision; the "right of recovery" to which the statute refers belongs to the agency, not the employee, and the right at issue refers to the agency's right to recover overpayments, not an employee's right to receive danger pay. Thus, section 5922(b) states that an agency may pay an allowance to an employee in advance "in such sums as are considered advisable in consideration of the need and the period of time during which expenditures must be made in advance by the employee." It further states that "[a]n advance of funds not subsequently covered by allowances accrued to the employee under this subchapter is recoverable by the Government by" either a "setoff against accrued pay, compensation, amount of retirement credit, or other amount due the employee from the Government" or "such other method as is provided by law for the recovery of amounts owing to the Government." Finally, the section contains a provision that allows the agency, "under regulations of the President," to "waive in whole or in part a right of recovery under this subsection, if it is shown that the recovery would be against equity and good conscience or against the public interest." Again, as is readily apparent, the "right of recovery" to which this waiver provision refers is the agency's right to recover advances made in error, not any "right" on the part of an employee to receive danger pay.

8

and the categories of employees to which the rates apply; and (3) other related matters"). It is the DSSR, and not the statute, that specifies the criteria for determining whether a particular post of duty presents a threat of harm that brings it within the statute, that specifies the percentage of a pay premium that attaches to particular posts of duty, and that defines which employees are eligible for danger pay. See DSSR § 650.

Notwithstanding the foregoing, plaintiffs contend that affording agencies discretion to not provide danger pay to employees conflicts with the purposes of the statute, as reflected in the preamble to the original Overseas Differential and Allowances Act of 1960, Pub. L. No. 86-707, 74 Stat. 792, and its legislative history. Pl.'s Resp. 6-11. Specifically, plaintiffs cite the following passage (captioned "Purpose") from Senate Report No. 86-1647 (June 22, 1960), reporting on the bill (H.R. 7758) which first established the authority to provide overseas differentials and allowances:

> The purpose of this bill is to improve and strengthen Government oversea activities by establishing a uniform system for compensating all Government employees in oversea posts irrespective of the agency by which they are employed. The bill would provide uniformity of treatment for all oversea employees to the extent justified by relative conditions of employment. Current applicable laws do not provide this uniformity. They authorize benefits for the employees of certain agencies, while the employees of other agencies are denied them because of the lack of statutory authority, even though the conditions of employment of the two groups are substantially the same.

According to plaintiffs, the government's argument that danger pay was intended to be discretionary is in "direct conflict" with the statutory purpose, which they claim was to "achiev[e] equality, comprehensive coverage and entitlement to danger pay among all federal employees and agencies engaged in certain overseas posts." Pl.'s Resp. at 8.

This argument is unpersuasive. First, the passage cited does not state that all government employees in oversea posts will receive danger pay; it states that all government employees will be subject to a "uniform system" and that no employees would be denied such pay because of an agency's "lack of statutory authority." The statutory purposes of establishing a "uniform system" for compensating Government employees who hold overseas posts is accomplished by providing all federal agencies, and not just those governed by the Foreign Service Act or other scattered pieces of legislation, with a common statutory authority (and set of rules) for exercising their discretion to grant overseas differentials and allowances. See S. Rep. No. 86-1647, at 1-2 (observing that the bill would "clarify and consolidate existing law" and "make H.R. 7758 all-inclusive in the field of oversea differential and allowance payments."). Indeed, the Report itself speaks in terms of grants of "authority" to provide the differentials and allowances, and not in terms of entitlements to such. Id. at 10.

Plaintiffs also rely upon language in the 1980 House and Senate Reports that accompanied the Foreign Service Act of 1980, the law that established agency authority to provide danger pay. They argue that this language "demonstrat[es] a congressional mandate that danger pay 'will be granted during the period when the threat of physical harm or imminent

9

danger to health or well-being exists.'" Pl.'s Resp. at 11 (quoting H.R. Rep. No. 96-992, Pt. 1, at 111) (emphasis in plaintiffs' brief). But plaintiffs' reliance upon this sentence wrenched out of its context is misplaced. In particular, it ignores that the preamble of the Report explicitly states that while amendments to Title 5, including the provision of danger pay, were "necessary and desirable in the interest of improving Foreign Service morale and easing the burdens of Foreign Service life," the "authorities are discretionary in nature and are not to be construed as creating new entitlements." H.R. Rep. No. 96-992, Pt. 1, at 107.

Nor do the provisions of the DSSR governing danger pay transform such pay into a mandatory entitlement. The DSSR, like the statute itself, uses the word "may" and refers to agency "authority" rather than employee rights when discussing danger pay. In fact, it specifies that an agency head may consider the availability of agency funds when deciding whether or not to grant danger pay, an authority clearly inconsistent with the notion that the DSSR mandates that danger pay allowances be provided to all eligible government employees. See DSSR § 013 ("When authorized by law, the head of an agency may . . . grant . . . danger pay allowance . . . to an employee of his/her agency and require an accounting therefor, subject to the provisions of these regulations and the availability of funds"); DSSR § 031.2. (stating that "danger pay allowance prescribed in Chapter 650 . . . may be granted to employees defined in Section 040i"). In fact, the DSSR specifically contemplates that agency heads may decide not to grant danger pay allowances that are authorized by the DSSR, stating that "[w]ithin the scope of these regulations, the head of an agency may issue such further implementing regulations as he/she may deem necessary for the guidance of his/her agency with regard to the granting of and accounting for these payments." DSSR § 013. See Roberts, 745 F.3d at 1165 (holding that DSSR provisions concerning living quarters allowances "are only money-authorizing and are not money-mandating" because section 013 contemplates that agencies may promulgate further regulations as he or she deems appropriate with regard to the granting of allowances).

Plaintiffs' claim that pursuant to the DSSR, "danger pay is money mandated unless waived by an agency" also finds no support in the language of the regulations. See Pl.'s Resp. 11-21. The DSSR nowhere requires an agency to provide danger pay. Rather, as described above, the DSSR sets forth a framework and rules governing danger pay allowances which govern when an agency exercises its discretion to provide such allowances to its employees. As the court of appeals noted when addressing a similar issue in Roberts, the statute and the DSSR "standing alone, are not money mandating" and "could only become money mandating if further regulations were implemented requiring payment." 745 F.3d at 1164.

Here, plaintiffs have failed to establish the existence of agency regulations or a formal agency policy by which all employees eligible to receive danger pay allowances under the DSSR must be provided such allowances. At best, the evidence plaintiffs submit show that CBP has had a practice of providing such pay to employees, in at least some cases, upon the request of their supervisors through the submission of the Standard Form 1190. But plaintiffs have not identified any agency-wide policy or directive that requires supervisors to request such allowances for employees who meet the State Department's eligibility criteria. The Court agrees with the government that emails by lower level personnel expressing their understanding that the payroll office would grant all supervisory requests for danger pay that fit within the DSSR, or a letter to a Member of Congress reciting that practice, are not equivalent to formal agency rules

and regulations or written directives and instructions that are binding and therefore serve as a "source of substantive law that creates the right to money damages." Mitchell, 463 U.S. at 216. Cf. Roberts, 745 F.3d at 1166-67 (holding that Department of Defense Directive and Naval Instruction implementing statute and DSSR provisions governing living quarters allowances provided money-mandating source of law upon which Tucker Act jurisdiction could be based).

## CONCLUSION

The government's partial motion to dismiss is **GRANTED** and Count II of plaintiffs' third amended complaint is **DISMISSED** without prejudice.

The parties shall file a joint status report within 30 days of the date of this Order, proposing a schedule for further proceedings in this case.

**IT IS SO ORDERED.**

                                                                         s/Elaine D. Kaplan
ELAINE D. KAPLAN
Judge, U.S. Court of Federal Claims